Filed 3/21/23 P. v. Tapiacastro CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JORGE TAPIACASTRO,<br><br>    Defendant and Appellant. | G060743<br><br>(Super. Ct. No. 20CF0770)<br><br>ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING; NO CHANGE IN JUDGMENT |

It is ordered that the opinion filed on February 22, 2023, be modified as follows:

In the disposition section on page 27, the second full paragraph beginning with "The sentence is vacated . . ." is deleted and replaced with the following:

"The sentence is vacated. If the trial court grants the motion to unseal juror contact information, it must allow Tapiacastro a reasonable time to file a motion for new trial. If (1) the court denies the motion for disclosure of jurors' identifying information, (2) the court grants the motion for disclosure of jurors' identifying information, but Tapiacastro fails to file a timely motion for new trial, or (3) Tapiacastro files a timely motion for new trial, but the court denies the motion for new trial, the court must resentence him applying section 1170, subdivision (b) as amended by Senate Bill 567.

Following resentencing, the court clerk shall prepare an amended abstract of judgment and forward a certified copy to the Department of Corrections and Rehabilitation."

This modification does not change the judgment. The petition for rehearing is DENIED.

O'LEARY, P. J.

WE CONCUR:

GOETHALS, J.

DELANEY, J.

2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G060743 |
| v. | (Super. Ct. No. 20CF0770) |
| JORGE TAPIACASTRO, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Steven D. Bromberg, Judge.  Affirmed in part, reversed in part, and remanded with instructions.

Jeffrey S. Kross, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Collette C. Cavalier and Ksenia Gracheva, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Jorge Tapiacastro was convicted of rape of an intoxicated person (count 1; Pen. Code, § 261, subd. (a)(3))[1], forcible rape (count 2; § 261, subd. (a)(2)), sexual battery by restraint (count 3; § 243.4, subd. (a)), and forcible false imprisonment (count 4; §§ 236, 237, subd. (a)). Counts 1 and 2 were pleaded in the alternative, resulting in count 2 being dismissed after the verdict.

In short, the evidence showed Tapiacastro was a driver for Lyft who picked the victim N.H. up in a drunken state late at night to drive her home. She fell asleep in the car. He stopped at a street address on East La Veta Avenue. Although we will omit the exact address in the interest of N.H.'s privacy, a key fact in this appeal is that the address was the same number as N.H.'s home address on *West* La Veta Avenue. Tapiacastro got into the back seat and had sexual intercourse with her. At trial, Tapiacastro testified the sex had been consensual. N.H. testified it was not.

Tapiacastro raises three challenges to the judgment on appeal.

First, he contends the trial court erred in denying a petition to unseal juror contact information. After the judgment was rendered, several jurors were interviewed by prosecutorial and defense investigators. One juror mentioned that another juror claimed in the jury room to have been an Uber driver. Tapiacastro had testified that Lyft does not give the passenger's exact address, which, he claimed, was why he stopped short of N.H.'s house. The juror who was an Uber driver claimed Uber does give an exact address and concluded Tapiacastro was lying about why he stopped short of N.H.'s house. The court ruled that, on the whole, the interviews revealed that the jurors' credibility conclusions were more influenced by other factors and denied the motion on the ground that Tapiacastro had not made a prima facie case of good cause.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

2

We conclude the trial court erred. At this stage in the proceeding, Tapiacastro need only make a prima facie case of misconduct in order to proceed to the next step of notifying jurors of Tapiacastro's petition. His counsel's declaration presented clear, specific evidence of misconduct in the form of interjecting extrinsic evidence into the deliberations. That misconduct is presumptively prejudicial, and the Attorney General has not rebutted that presumption by showing there is no reasonable likelihood of establishing prejudice. Importantly, whether or not jury misconduct *actually* prejudiced the result is a question for a future day (i.e., a motion for a new trial). The only question at this stage is whether Tapiacastro is entitled to gather evidence from the jurors. He is entitled to proceed with the next step of his petition.

Second, Tapiacastro contends there was insufficient evidence that N.H. was so intoxicated that she lacked the capacity to consent. We conclude otherwise.

Finally, Tapiacastro contends that Senate Bill No. 567 (2021–2022 Reg. Sess.) (Senate Bill 567) requires resentencing, a contention the Attorney General agrees with. Effective January 1, 2022, Senate Bill 567 amended section 1170, subdivision (b), so that a sentence beyond the middle term must now be supported by an aggravating factor found *by the jury* to be true beyond a reasonable doubt. Here, the trial court selected the high term on count 1 based on aggravating factors that the jury was not called upon to decide. Although the court made its ruling prior to the effective date of Senate Bill 567, the new law applies retroactively to non-final judgments. Accordingly, we will vacate the sentence and remand for resentencing.

FACTS

On August 31, 2019, Labor Day weekend, N.H. worked a full day, went home, then attended a gathering at the apartment of a friend-of-a-friend. N.H.'s husband dropped her off because she anticipated drinking alcohol. He did not stay because it was a girls' night out. N.H. arrived around 8:00 or 9:00 o'clock in the evening. She

3

consumed three or four vodka sodas. Around 10:00 or 11:00 o'clock that night, the attendees went to a bar in Huntington Beach. They used a rideshare service for transportation because they had been drinking already.

When the group arrived, they got a table for their exclusive use, which required them to buy a bottle of liquor. N.H. had another four or five vodka sodas at the bar. Around 12:30 a.m., N.H. grew tired from the alcohol and long day of work and decided to leave. She summoned a car through the rideshare mobile phone application (app) Lyft. Having used Lyft before, her home address was preset in the app. She was drunk at this point, though not throwing up, nor to the point of being unable to use her phone. She walked down some stairs into a shopping center to meet her ride. Tapiacastro was the Lyft driver who arrived to pick her up. She got in the vehicle.

As of the time of trial, the next thing N.H. could remember after getting in the Lyft vehicle was being somewhere in the City of Orange in a location she vaguely recognized, but did not know exactly where she was. N.H. only remembered what happened next in "flashes." She believed she had fallen asleep during the ride. She was in the backseat and recalled Tapiacastro saying, "I think you're beautiful." N.H. remembered Tapiacastro getting out of the driver's seat, and sitting next to her in the back seat. Tapiacastro grabbed N.H.'s wrist and raised it up. She vaguely recalled Tapiacastro getting between her legs and pulling her underwear down. She recalled feeling vaginal penetration. She remembered crying. At no point did she consent to sex. She remembered either falling out or being pushed out of the car. At that point she was laying on her side on the grass next to a sidewalk.

From there, she had the presence of mind to take a photograph of Tapiacastro's license plate. She did that because she "felt something went wrong." She was not certain but thought she may have been raped. She was confused.

4

The next thing she did was call her friend, who had been at the bar with her. N.H. was stumbling and falling and crying. Her friend suggested that she call her husband, and she tried to teach N.H. how to send her current location to her husband. After walking some distance, she came across a liquor store that she recognized. She called her husband to pick her up there. They drove home, which was about a three-minute drive.

Her husband kept asking her why she was crying. She did not respond at first, but once they arrived home she told him she believed she had been raped. Her husband then drove her to a hospital, and then to a second hospital that was better equipped to administer appropriate tests.

At approximately 6:40 a.m., a forensic nurse drew a blood sample from N.H. that revealed N.H.'s blood alcohol content (BAC) was 0.131 percent. The nurse also obtained a urine sample, which was positive for diphenhydramine (Benadryl). The nurse took vaginal swabs to test for the presence of semen. The test was positive, and a DNA profile was obtained from the sperm. At a later point in the investigation, a buccal swab was taken from Tapiacastro and tested. The DNA profiles from the semen sample and Tapiacastro's buccal swab were the same.

In the early morning after the evening in question, N.H. was interviewed by City of Orange Police Officer Mario Perez. N.H. relayed substantially the same account as her testimony at trial. Beyond that testimony, she told him that Tapiacastro pulled down her underwear and inserted his erect penis into her vagina. She relayed that she had attempted to push him away with her left hand. She said the doors were unlocked and she tried to get out and run away, but Tapiacastro held the door closed. She indicated the sexual intercourse lasted approximately three minutes.

A little over two weeks later, Detective Keith Short of the City of Orange Police Department interviewed N.H. Short showed N.H. a "six-pack" photographic

5

lineup of males and was asked to identify the person who she believed raped her. She identified a photograph of Tapiacastro.

By this time, N.H.'s memory of the incident had deteriorated substantially. On the night in question, N.H. was wearing a long dress with spandex shorts underneath. At the time of the interview, she could not remember whether the vaginal penetration had been over her spandex shorts or under. She told Short, "[T]o be honest, I don't know if I was raped or not, but better safe than sorry." She was "in the state of blacking in and out."

Investigator Bruce Linn of the Orange County District Attorney's Office received business records from Lyft, which contained latitude and longitude coordinates and a time stamp showing the date, time, and location for September 1, 2019. Using the coordinates, he was able to plot the route from the location where Tapiacastro picked N.H. up to where he dropped her off. It showed Tapiacastro picked N.H. up on September 1, 2019, at 12:50 a.m., at Pacific View Avenue in Huntington Beach, and he dropped her off at 1:20 a.m. on the corner of South Center Street and East La Veta Avenue in Orange, which was not N.H.'s home address. A video demonstrating the travel route showed that after exiting the freeway, there was a six-minute pause before Tapiacastro continued north, made a turn, and stopped at the corner of East La Veta Avenue and South Center Street.

On cross-examination, although Linn was not willing to testify that Tapiacastro had stopped at the exact numerical address on East La Veta Avenue that corresponded to N.H.'s home address on West La Veta Avenue, he admitted that East and West La Veta Avenue are separated by Glassell Street, and where Tapiacastro dropped N.H. off was equidistant from Glassell Street as N.H.'s home address on West La Veta Avenue. A defense investigator would later testify that he utilized the global positioning systems (GPS) to drive to the numerical street address on East La Veta

6

Avenue that corresponded to N.H.'s home address on West La Veta Avenue, and the GPS took him to the same corner where defendant dropped N.H. off.

Robert Reckers, called by the prosecution, is a forensic scientist and expert in alcohol-related examination with the Orange County crime lab. Reckers analyzed N.H.'s blood sample collected on September 1, 2019, at around 6:40 a.m. The blood test result showed that N.H.'s BAC was 0.130 percent. At around 0.12 percent BAC, a person who is not tolerant to alcohol can either pass out or vomit. A person who drank once a month, as N.H. testified she did, would have decreased alcohol tolerance.

Reckers testified that he would expect N.H.'s BAC to have been between 0.20 and 0.23 percent five hours earlier, at around 1:30 a.m.[2] At that BAC, depending on their alcohol tolerance, the intoxicated person may have slurred speech, a red flushed face, red bloodshot and watery eyes, and may lose consciousness. A person who did not eat very much, as N.H. testified she did, and drank seven to 10 vodka drinks over the course of several hours until 12:30 a.m., would reach the peak of their intoxication within an hour, by 1:30 a.m. The intoxicated person would smell like alcohol to someone within one to two feet from them. A person close enough to have sexual intercourse with the intoxicated person would smell the alcohol within the hour of the intoxicated person stopping drinking.

Tapiacastro took the stand in his own defense and relayed a very different version of the night's events. Tapiacastro went to Huntington Beach to pick up a passenger near Pacific City at around 12:45 a.m. that night. When he arrived, he saw his passenger, N.H., standing with another woman. N.H. appeared normal. She was not staggering or vomiting, or doing anything out of the ordinary. Tapiacastro saw that N.H. looked at her phone and then back at his license plate before getting in the car. She walked over to the car without stumbling or falling and got into the car in the back seat

---

[2] A defense expert came to roughly the same conclusion.

on the passenger side.  Once she was in the car, the woman who had been standing with her left.  N.H. did not appear to be drunk.  Tapiacastro pressed the button indicating that he had picked N.H. up, and the app generated step-by-step directions to the destination.  Tapiacastro did not talk at all.  He followed the directions.  N.H. never told him the exact address where she was going, or said anything else.  After about 20 to 25 minutes, the GPS announced, "'You have arrived at your destination.'"  According to Tapiacastro, the Lyft app does not communicate the destination address.  Tapiacastro pulled over to the side of the street, stopped, and pressed another button to indicate that he had arrived.

After Tapiacastro pulled over, N.H. did not do or say anything, and did not get out of the car.  Tapiacastro said, "'I'm here at your address,'" in English.  N.H. did not respond.  Tapiacastro repeated that he was at her address a second time, but N.H. still did not respond.  Tapiacastro thought that N.H. was sleeping.  He opened the driver's door, got out of the car, walked around to the back, and opened the rear passenger side door.  The light inside of the car turned on.  Tapiacastro saw that N.H. was lying across the seat with her head toward the driver's side and was sleeping.  Tapiacastro testified that "it never occurred to [him] that she was drunk."

Tapiacastro told N.H. twice more they were at her address, but she did not respond.  Something like this had never happened to Tapiacastro in any of his previous thousand Lyft rides.  Tapiacastro then "put [his] hand in there to remove her."  He put his hand over N.H.'s dress on her hip and moved her, and said, "'Wake up.'"  N.H. woke up and sat up in the seat on the passenger side.  Tapiacastro was still standing outside of the car.  N.H. did not say anything after sitting up and did not get out of the car.  Tapiacastro then grabbed her hand and tried to pull her out of the car.  He told her, "'Come on.  I got to go.'"  N.H. still did not respond and did not get out of the car.  Tapiacastro admitted that at this point, he suspected she was drunk.

8

Tapiacastro grabbed N.H.'s hand again to get her out of the car and said, "'Come on. I got to go.'" Instead of getting out of the car, N.H. "was bringing [Tapiacastro's] hand down to her vagina." She put Tapiacastro's hand under her dress, on her vagina but over her underwear. Tapiacastro removed his hand from N.H.'s vagina and asked her if she was crazy. Tapiacastro thought "that it was wrong. It was wrong what this lady was doing." N.H. still did not say anything, and did not get out of the car when Tapiacastro pulled his hand back.

Tapiacastro grabbed N.H.'s hand a second time to try to get her out and told her again, "'Come on. I got to go.'" Once more, N.H. did not get out of the car or say anything, but "took [Tapiacastro's] hand down to her vagina again." Tapiacastro removed his hand. After N.H. put his hand on her vagina the second time, Tapiacastro was thinking "the lady was crazy." N.H. still did not say or do anything or get out of the car. Tapiacastro tried pulling her by the hand again, but N.H. "took [his] hand back" to her vagina for the third time. This time, Tapiacastro decided to masturbate N.H. because "that's what she wanted" and "she was insisting that [Tapiacastro] touch her" by putting his hand there. After Tapiacastro began masturbating N.H., she started touching his penis. N.H. still did not say anything to Tapiacastro but started to spread her legs and make sexual noises. Tapiacastro was still standing outside the car. After about one minute, N.H. lied back and pulled Tapiacastro's hand as if to get him into the car. Tapiacastro thought that N.H. wanted to have sexual intercourse, so he got into the car and closed the door, which turned off the overhead light. Tapiacastro testified that he believed N.H. knew what she was doing.

When Tapiacastro got into the car, N.H. lied down and pulled one leg out of her underwear. Tapiacastro got on top of her and she opened her legs. Tapiacastro then had sexual intercourse with N.H. for about three or four minutes, until he ejaculated. He never asked N.H. whether she wanted to have sex and said nothing at all to N.H.

9

during or after the sex. He never grabbed or held N.H.'s wrist, or held her down. She never struggled to get away from him. He never told her that she was beautiful. N.H. was responsive during the sex and pushed Tapiacastro toward her with her hands.

Tapiacastro did not smell any alcohol on N.H. and did not kiss her. N.H. did not say anything to Tapiacastro during the sexual intercourse. She did not tell Tapiacastro to stop. When he was finished, Tapiacastro got out of the car and put his pants back on. N.H. also put her clothes back on and got out of the car. She did not say anything to Tapiacastro after she got out of the car. She did not fall down and was not lying in the grass. Tapiacastro believed that she was at her destination. He got back in his car and left. Tapiacastro testified that the only reason he had sex with N.H. was "[b]ecause she wanted to have sex at that moment, and that's it." He was not interested in contacting her again because he did not like her and did not want to have sex with her again.

Tapiacastro testified he used to drink and attend parties with people drinking, but claimed that he had only seen drunk people "get happy." He had never seen drunk people get into fights, fall down, or pass out from drinking. He had never even seen anyone get tired because of drinking. However, Tapiacastro later testified that he can always tell if somebody is drunk. Tapiacastro further testified that even though he typically drives for Lyft from 7:00 p.m. to 2:00 a.m. on weekends and picks passengers up at bars, he picks up passengers "that have not been drinking." When asked whether he knows that people drink at bars, Tapiacastro answered, "I think so, yes."

Tapiacastro also testified he thought N.H. was drunk when she did not want to get out of the car, but not when he was having sexual intercourse with her a couple of minutes later. On cross-examination, the prosecutor asked, "So when she didn't want to get out [of the car], you thought she may have been drunk, but then when you were having sex with her, you thought she wasn't drunk?" Tapiacastro replied, "Yes." When

10

asked whether he thought N.H. had sobered up in 20 seconds, Tapiacastro replied, "Well, that's what I would like to know. What happened?" Later, Tapiacastro further testified that he did not think N.H. was drunk that night after all, but rather something was simply wrong with her because it struck him as odd that somebody who had only been in his car for 20 minutes wanted to have sex with him.

On further cross-examination, Tapiacastro was asked if he grabbed N.H.'s breasts. This exchange turned out to be important to the jury, as will be seen below:

"[Prosecutor]: Didn't grab her breasts?

"[Tapiacastro]: Yes, she asked me to.

"[Prosecutor]: Did you grab her breasts?

"[Tapiacastro]: Right when we were having relations . . . .

"[Prosecutor]: Over the dress or under the dress?

"[Tapiacastro]: Well, she pulled out her breasts, so I grabbed them.

"[Prosecutor]: She pulled out her breasts, so her dress went all the way up to her head?

"[Tapiacastro]: No. I believe it's two pieces of the dress, not just one.

"[Prosecutor]: . . . Your testimony is what [N.H.] was wearing was two pieces?

"[Tapiacastro]: Yes."

In fact, her dress was a one-piece dress.

Tapiacastro testified he had been working for Lyft as a driver for about seven months. In that time, Tapiacastro provided more than 1,000 rides. He had never received any complaints from any of his passengers or from Lyft.

In the end, the jury returned a guilty verdict on all counts.

Several days later, Tapiacastro filed the petition that is the subject of this appeal: a "petition to unseal the juror contact information to allow the defense to

11

investigate juror misconduct." (Capitalization omitted.) Defense counsel attached a declaration in which he claimed the following events transpired. "After being discharged by the court following the rendering of the verdict, the jurors were told they could now speak with the attorneys if they so desired." "Approximately [six to seven] jurors met with the prosecutor and defense counsel in the hallway . . . ." "During the course of those discussions, one of the jurors stated that another juror had announced at the beginning of deliberations that he was a former UBER driver." "That juror went on the tell the jury panel that UBER always gave the passenger destination, both before pick-up and at the destination." "Based on his experience with UBER, that juror then told the jury panel that Defendant was lying when he said he did not receive the destination from LYFT."

Tapiacastro's counsel argued these facts supported unsealing the juror contact information: "Defendant ended up at the wrong address on the night of the incident, the location where the assault allegedly took place. Instead of taking his passenger to [N.H.'s street address on] West La Veta in the City of Orange, Defendant took her to [the same street address on] EAST La Veta in the City of Orange. Defendant's uncontroverted testimony at trial was that LYFT does not announce the destination address of the passenger, but simply begins announcing directions once the passenger is in the car. He testified that he followed the directions given to him by LYFT as he had on all the other rides he had given for LYFT and that the LYFT app simply announced 'You have arrived' without announcing the address when he reached the destination. It was the defense['s] contention that either the victim, in her intoxicated state, entered the wrong address, or that LYFT made an error in sending him the directions. This was very important in explaining to the jury why Defendant ended up at [the street address on] EAST La Veta that night, to counter the prosecution's contention that he intentionally took the victim to a location other than her destination in order to carry out his nefarious purpose."

12

The prosecution opposed the motion by arguing, as the Attorney General does on appeal, that what defense counsel described was not misconduct. The prosecution attached the declarations of two district attorney investigators who were also present at the conversation with the jurors. According to investigator Ty Hagenson, he and another district attorney investigator initiated the conversation with five or six jurors immediately after the jury was discharged. The prosecutor and defense counsel joined the conversation about five minutes later. Hagenson reported the following: "The jurors conveyed that, pretty much from the beginning of deliberations, they agreed the Defendant was guilty on all counts but one, the False Imprisonment. The problem they had with the False Imprisonment charge was the 'force' element of the crime. They finally agreed the rape itself constituted force." "The jurors said there were several items of evidence they found very convincing toward guilt; the photos of the license plate and the fact the victim had the determination to take them, the one-piece dress and the defendant's testimony about it, and the testimony of the Defendant that he did not know what drunk people looked like. They found it ludicrous that a LYFT driver would not know what a drunk person looks like. [¶] They said they found the Victim's testimony to be very believable." "At one point, the drop off location of the victim was discussed and one of the jurors said another juror, who was not present, said during deliberations he used to be an Uber driver and he described a procedure used at Uber. I do not remember specifically what procedure was described." Investigator Robert Bogue reported similar facts, including the following: "There was a juror who mentioned that there was another juror who was an Uber driver but I never heard that the Uber driver was remotely a deciding factor of guilty."

The trial court denied the motion. The court concluded the evidence of Tapiacastro's guilt was "overwhelming." The court further concluded that the jury relied on other factors as "convincing evidence of guilt." Tapiacastro appealed.

13

DISCUSSION

I. *The Trial Court Erred by Denying the Motion to Unseal Juror Contact Information*

Tapiacastro first contends the trial court erred by denying his motion to unseal juror contact information. The statutes governing such motions are Code of Civil Procedure sections 206 and 237.

Code of Civil Procedure section 206, subdivision (g), provides, "Pursuant to Section 237, a defendant or defendant's counsel may, following the recording of a jury's verdict in a criminal proceeding, petition the court for access to personal juror identifying information within the court's records necessary for the defendant to communicate with jurors for the purpose of developing a motion for new trial or any other lawful purpose. This information consists of jurors' names, addresses, and telephone numbers. The court shall consider all requests for personal juror identifying information pursuant to Section 237."

Code of Civil Procedure section 237, subdivision (a)(2), provides, "Upon the recording of a jury's verdict in a criminal jury proceeding, the court's record of personal juror identifying information of trial jurors, as defined in [Code of Civil Procedure s]ection 194, consisting of names, addresses, and telephone numbers, shall be sealed until further order of the court as provided by this section."

Section 237, subdivision (b) of the Code of Civil Procedure provides a right to petition to unseal those records: "Any person may petition the court for access to these records. The petition shall be supported by a declaration that includes facts sufficient to establish good cause for the release of the juror's personal identifying information. The court shall set the matter for hearing if the petition and supporting declaration establish a prima facie showing of good cause for the release of the personal juror identifying information, but shall not set the matter for hearing if there is a showing on the record of facts that establish a compelling interest against disclosure. A compelling interest

14

includes, but is not limited to, protecting jurors from threats or danger of physical harm. If the court does not set the matter for hearing, the court shall by minute order set forth the reasons and make express findings either of a lack of a prima facie showing of good cause or the presence of a compelling interest against disclosure." Subdivision (c) explains the juror's right to attend the hearing and oppose the petition, and subdivision (d) provides that the petition must be granted "unless a former juror's protest to the granting of the petition is sustained." (*Id.*, subds. (c) & (d).) We need not quote those subdivisions at length, however, because this case never made it that far. The petition was denied at the prima facie stage under subdivision (b).

A. *Standard of Review*

Before analyzing the trial court's ruling, we first address the standard of review. It has been said, "Trial courts have broad discretion when ruling on a motion to release juror contact information." (*People v. Zamora* (2022) 73 Cal.App.5th 1084, 1090 (*Zamora*).) And that is certainly true in general. Code of Civil Procedure section 237, subdivision (b), authorizes "[a]ny person" to file a petition to unseal juror contact information, and, ultimately, subdivision (d) allows the court to sustain a juror protest "if, in the discretion of the court, the petitioner fails to show good cause . . . ." If, for example, a person sought to unseal juror information for the purpose of writing a school paper, the court might, in its discretion, decide that the juror's right to privacy outweighs the social utility of the school paper. Moreover, the statute permits the court to deny a petition based on a compelling interest against disclosure, such as juror safety, and that is a matter within the court's discretion.

However, when the petition is filed by a defendant seeking to establish juror misconduct for the purpose of filing a motion for a new trial, and the petition is denied on the ground that defendant failed to establish good cause, existing standards of review require a more nuanced approach. The first step in a petition under Code of Civil

15

Procedure section 237 is to determine whether the petitioner has made "a prima facie showing of good cause . . . ." (*Id.*, subd. (b).)  Where the petition is based on misconduct, that inquiry is essentially whether the petitioner made a prima facie case of juror misconduct that could lead to a successful motion for new trial.  Two existing principles of law bear on the appropriate standard of review of such a ruling.

First, the concept of a prima facie case is common in the law, and in nearly every case, we review a prima facie case de novo.  (See, e.g., *People v. Scott* (2015) 61 Cal.4th 363, 384 [court reviewed de novo whether defendant had made a prima facie case of racial discrimination in use of peremptory challenges]; *People v. Ervin* (2021) 72 Cal.App.5th 90, 104 [whether defendant made a prima facie showing for relief under former section 1170.95 (now § 1172.6) reviewed de novo]; *County of Sacramento v. Superior Court* (2012) 209 Cal.App.4th 776, 778–779 [court reviews de novo whether defendant made a prima facie case for summary judgment]; *ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 999 [whether plaintiff made a prima facie showing of merit in anti-SLAPP motion subject to independent review].)  As another panel of this court recently explained in *Zamora*, "'Prima facie evidence is that which will support a ruling in favor of its proponent if no controverting evidence is presented.  [Citations.]  It may be slight evidence which creates a reasonable inference of fact sought to be established but need not eliminate all contrary inferences.'" (*Zamora, supra,* 73 Cal.App.5th at p. 1091.)  Generally speaking, this sort of inquiry depends on a legal determination that we review independently.

Second, since the ultimate aim of obtaining juror contact information is to file a motion for a new trial based on juror misconduct, our review at this preliminary stage must be rationally related to our review at the later stage.  Our review of a court's finding as to misconduct in a motion for new trial is mixed.  Where a new trial is granted, our review is deferential:  abuse of discretion.  (*People v. Ault* (2004) 33 Cal.4th 1250,

16

1271–1272.)  However, where the motion is denied—which is the procedural analog of the denial in the present matter—our review is independent.  We review the court's resolution of disputed facts for substantial evidence, but once the facts are established, "whether those facts constitute misconduct [is] a legal question we review independently." (*People v. Collins* (2010) 49 Cal.4th 175, 242.)  Moreover, we *independently* review whether the misconduct was prejudicial.  (*People v. Weatherton* (2014) 59 Cal.4th 589, 598.)

Given the foregoing legal principles, it would make little sense to accord the trial court broad discretion to determine no prejudicial misconduct occurred at this preliminary stage, where petitioner need only make a prima facie showing of good cause. Since the court's ruling here was based on a finding that Tapiacastro had not made a prima facie case of prejudicial misconduct, we will review the court's ruling de novo.

B. *Legal Test*

Because, in this specific context, the petitioner's ultimate aim is to file a motion for a new trial based on jury misconduct, the good-cause analysis must reflect that ultimate aim.  After all, if the alleged juror misconduct is dead on arrival for purposes of a new trial motion, then there simply is no good cause to unseal juror contact information.  Accordingly, the trial court's analysis should parallel the analysis of a new trial motion, while accounting for the fact that a motion to unseal juror information is a preliminary motion with a significantly lower burden of proof for the petitioner.

That burden is "good cause," which has been described as "'a sufficient showing to support a reasonable belief that jury misconduct occurred . . . .' [Citation.]" (*People v. Cook* (2015) 236 Cal.App.4th 341, 345–346.)  The petitioner need not prove prejudicial misconduct *actually* occurred—which is the burden at the new trial motion— but instead must show a reasonable likelihood that it occurred.  (*People v. Johnson* (2013) 222 Cal.App.4th 486, 493 (*Johnson*) ["the defendant simply has to prove

17

that talking to the jurors is reasonably likely to produce admissible evidence of juror misconduct"].) With that in mind, we turn to the legal test for a new trial motion, which will serve as a guide in our analysis of the petition to unseal juror contact information.

"When a party seeks a new trial based upon jury misconduct, a court must undertake a three-step inquiry. The court must first determine whether the affidavits supporting the motion are admissible under Evidence Code section 1150, subdivision (a). If the evidence is admissible, the court must then consider whether the facts establish misconduct. [Citation.] Finally, assuming misconduct, the court must determine whether the misconduct was prejudicial. [Citations.]" (*People v. Von Villas* (1992) 11 Cal.App.4th 175, 255, fn. omitted.) The same three steps, taking into account the lower burden of proof, should be undertaken in a motion to unseal juror contact information where the ultimate aim is to file a new trial motion based on juror misconduct.

1. *Evidence Code Section 1150*

First, the trial court must examine the proffered evidence to see if it is the type of evidence that could survive Evidence Code section 1150, subdivision (a) (section 1150). That section provides as follows: "Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined."

"This statute distinguishes 'between proof of overt acts, objectively ascertainable, and proof of the subjective reasoning processes of the individual juror, which can be neither corroborated nor disproved . . . .' [Citation.] 'This limitation

18

prevents one juror from upsetting a verdict of the whole jury by impugning his own or his fellow jurors' mental processes or reasons for assent or dissent. The only improper influences that may be proved under section 1150 to impeach a verdict, therefore, are those open to sight, hearing, and the other senses and thus subject to corroboration.'" (*People v. Steele* (2002) 27 Cal.4th 1230, 1261 (*Steele*).) "Evidence Code section 1150, while rendering evidence of the jurors' mental processes inadmissible, expressly permits, in the context of an inquiry into the validity of a verdict, the introduction of evidence of 'statements made . . . within . . . the jury room.' We have warned, however, that such evidence 'must be admitted with caution,' because '[s]tatements have a greater tendency than nonverbal acts to implicate the reasoning processes of jurors.' [Citation.] But statements made by jurors during deliberations are admissible under Evidence Code section 1150 when 'the very making of the statement sought to be admitted would itself constitute misconduct.'" (*People v. Cleveland* (2001) 25 Cal.4th 466, 484.)

Section 1150 is not merely a rule of evidence, it is "substantive law." (*Steele, supra,* 27 Cal.4th at p. 1263.) "[E]vidence that violates . . . section 1150 is not merely inadmissible, it is irrelevant—'of no jural consequence.'" (*Johnson*, *supra,* 222 Cal.App.4th at p. 494.)

In this case, the parties and the trial court seem to have wholly forgotten section 1150. The investigator declarations submitted by the prosecution are chock-full of statements that violate section 1150. Tapiacastro raised no objection to these declarations. The court described them as "extremely helpful" and relied on them extensively, including citing lengthy portions of the offending material. For example, relying on the offending declarations, the court stated, "Jurors found, from what the three declarations tell the court, that they found, as convincing evidence of guilt, a number of factors. Photographs that the victim took of the license plate. Defendant's testimony regarding that infamous one-piece dress; that the defendant said he did not know what

19

drunk people looked like. They found it ludicrous that a Lyft driver would not know what drunk people looked like. They found the victim to be incredibly believable. But not withstanding that, they did not find the defendant to be believable, and they listed numerous reasons for it." Every bit of this evidence is irrelevant and inadmissible under section 1150. It could not be considered in a new trial motion, and, likewise, cannot be considered in a motion to unseal jury contact information.

However, we conclude defense counsel's declaration survives section 1150 because it reflects an overt statement, open to the senses, that constitutes misconduct. According to defense counsel, "one of the jurors stated that another juror had announced at the beginning of deliberations that he was a former UBER driver." "That juror went on the tell the jury panel that UBER always gave the passenger destination, both before pick-up and at the destination." "Based on his experience with UBER, that juror then told the jury panel that Defendant was lying when he said he did not receive the destination from LYFT." This declaration reflects a specific statement, made aloud, which, as we conclude below, would constitute misconduct. Accordingly, defense counsel's declaration was admissible.

2. *Jury Misconduct*

The second step is to determine whether the admissible evidence supports a prima facie case of misconduct. "It is well established it is misconduct for a juror to conduct an independent investigation of the facts, to bring outside evidence into the jury room, to inject his or her own expertise into the jury's deliberation or to engage in an experiment which produces new evidence." (*Smoketree–Lake Murray, Ltd. v. Mills Concrete Construction Co.* (1991) 234 Cal.App.3d 1724, 1746.) "A juror commits misconduct by making a 'claim to expertise or specialized knowledge of a matter at

20

issue.' [Citation.]" (*People v. Engstrom* (2011) 201 Cal.App.4th 174, 185 [citing *In re Malone* (1996) 12 Cal.4th 935, 963].)

Here, the statement at issue reflects outside evidence injected into the jury deliberation:  that the juror had expertise as an Uber driver and that Uber provided drivers with a destination address, together with the implication that Lyft did so as well.

The Attorney General argues this is not misconduct.  They cite *In re Malone, supra,* 12 Cal.4th at page 963, where the court stated, "It is not improper for a juror, regardless of his or her educational or employment background, to express an opinion on a technical subject, so long as the opinion is based on the evidence at trial. Jurors' views of the evidence, moreover, are necessarily informed by their life experiences, including their education and professional work."  The Attorney General stops the quote there, but the remainder of the quote reveals the weakness in their argument:  "A juror, however, should not discuss an opinion explicitly based on specialized information obtained from outside sources.  Such injection of external information in the form of a juror's own claim to expertise or specialized knowledge of a matter at issue is misconduct.  [Citations.]" (*Ibid.*)

What these policies reflect is a compromise between, on the one hand, the legal ideal of a jury deciding a matter solely based on evidence admitted in the trial court and subject to the defendant's constitutional right of cross-examination, and, on the other, the reality that jurors cannot divorce their assessment of the evidence from their education and life experiences.  The compromise is this:  jurors can base their decision on their education and life experiences, but cannot communicate the premises they relied on if they constitute specialized information that goes beyond common sense and experience.  (See *In re Lucas* (2004) 33 Cal.4th 682, 696 [discussing matters "of common knowledge or experience" is not misconduct].)

21

While there are undoubtedly some aspects of rideshare services that are matters of common knowledge and experience, what the juror allegedly shared in this case was highly specific and based on occupational expertise. It would be common knowledge that ride share services generally employ mapping technology and announce directions out loud. However, whether a driver is given a specific destination address or is simply given directions is not a matter of common knowledge. Accordingly, the statement defense counsel reported was misconduct.

3. *Prejudice*

The final question is whether the petitioner has shown a reasonable likelihood that the misconduct was prejudicial. We begin by noting that the misconduct at issue here creates a presumption of prejudice: "It is misconduct for a juror to consider material [citation] extraneous to the record. [Citations.] Such conduct creates a presumption of prejudice that may be rebutted by a showing that no prejudice actually occurred. [Citation.]" (*People v. Mincey* (1992) 2 Cal.4th 408, 467.)

At a new trial motion, "'[t]he verdict will be set aside only if there appears a substantial likelihood of juror bias. Such bias can appear in two different ways. First, we will find bias if the extraneous material, judged objectively, is inherently and substantially likely to have influenced the juror. [Citations.] Second, we look to the nature of the misconduct and the surrounding circumstances to determine whether it is substantially likely the juror was actually biased against the defendant. [Citation.] The judgment must be set aside if the court finds prejudice under either test.'" (*People v. Williams* (2006) 40 Cal.4th 287, 333-334.)

"There are several factors and events courts consider in evaluating whether prejudice does not exist or actual harm was reasonably probable: the 'nature, scope, and frequency' of the misconduct [citations]; if the jury was readmonished against the misconduct [citation]; if 'the misconduct goes to a key issue in the case' [citation]; and

22

the apparent authority of the source of the misconduct . . . ." (*People v. Flores* (2021) 70 Cal.App.5th 100, 113.)

As we have said, the petitioner's burden is relatively light at this stage of the proceeding: a reasonable likelihood. Once the petitioner has shown misconduct, that level of prejudice is presumed. To rebut that presumption, the prosecution has a correspondingly heavy burden: showing there is no reasonable likelihood that the misconduct could be prejudicial. This burden is not only the logical corollary of the petitioner's light burden, but also reflects the reality of the procedural posture: the defendant has not had a chance to gather evidence yet. "The whole point of moving for the disclosure of jurors' identifying information is to talk to the jurors; and the whole point of talking to the jurors is to obtain evidence of juror misconduct that will support a motion for new trial." (*Johnson, supra,* 222 Cal.App.4th at p. 493.) If the prosecution is going to stymie a defendant's new trial motion before the defendant can even gather evidence, its showing must be a strong one.

Here, the prosecution did not carry its burden of showing no reasonable likelihood of prejudice. At the end of the day, this trial was fundamentally a credibility contest between N.H. and Tapiacastro. Any extrinsic evidence that tended to impugn Tapiacastro's credibility raises at least the reasonable likelihood of prejudice. Indeed, at trial, when the prosecutor sought to introduce evidence that Tapiacastro stopped well short of N.H.'s home address, the prosecutor noted that "one of the points of contention is whether or not he dropped her off where he thought he should have dropped her off." This seemed to suggest the issue was important to the prosecutor at the time. Objectively, moreover, the issue does seem fairly important. If Tapiacastro intentionally stopped short of N.H.'s destination while she was asleep, that raises a strong implication that he did so to rape her. On the other hand, the fact that he stopped at a street address on *East* La Veta Avenue that was the same as N.H.'s address on *West* La Veta Avenue

23

gives some plausibility to his explanation that he stopped where he was directed to stop. We also note that the juror's statement was apparently made early in the deliberations. These factors are suggestive of prejudice.

There were certainly many points of weakness in Tapiacastro's testimony, and, at the end of the day, it may well be that his new trial motion fails because those weaknesses outweigh any possible prejudice. We express no opinion on that at this stage. However, until Tapiacastro is given the opportunity to gather the evidence, we simply cannot know, and there is at least a reasonable likelihood that the misconduct was prejudicial.

II. *Substantial Evidence Supports the Rape of an Intoxicated Person Conviction*

Tapiacastro contends that substantial evidence did not support count 1, which was rape of an intoxicated person. (§ 261, subd. (a)(3).) In determining the sufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Jackson v. Virginia* (1979) 443 U.S. 307, 319.) "[T]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.)

Section 261, subdivision (a)(3), defines rape of an intoxicated person as sexual intercourse where "a person is prevented from resisting by an intoxicating or anesthetic substance, or a controlled substance, and this condition was known, or reasonably should have been known by the accused." Tapiacastro contends the evidence was inadequate to prove that N.H. was prevented from resisting.

Pursuant to CALCRIM No. 1002, the jury was instructed as follows: "A person is *prevented from resisting* if he or she is so intoxicated that he or she cannot give legal consent. In order to give legal consent, a person must be able to exercise reasonable judgment. In other words, the person must be able to understand and weigh the physical nature of the act, its moral character, and probable consequences. Legal consent is consent given freely and voluntarily by someone who knows the nature of the act involved."

Tapiacastro's argument rests primarily on the fact that N.H. was crying during the sexual intercourse and later told Perez that she recalled attempting to push Tapiacastro away with her left hand. Tapiacastro concludes: "Thus, while N.H. might not have had the strength to overcome the force used against her, she very clearly *did* attempt to resist the assault." Tapiacastro also notes that N.H. was capable of using her phone and navigating the stairs from the bar down to the pick-up point.

Tapiacastro's argument is unpersuasive and easily met. Tapiacastro's primary argument misses the point entirely. We are not concerned about N.H.'s ability to resist *during* the sexual intercourse. Perhaps the assault itself jolted her into sufficient mental capacity to resist. Rather, we are concerned with her capacity to resist at the *outset* of the sex. Capacity to resist is defined in terms of consent, and consent must happen prior to the sex. And on that point, the evidence was uncontroverted that N.H. was asleep in the back of Tapiacastro's car, late at night, with copious amounts of alcohol in her system. At the moment she was woken up, mid-assault, in an unknown and dark location, the jury could easily find that she was extremely groggy and disoriented and in no shape to resist or consent. Moreover, the fact that she was able to use her phone and walk down stairs prior to the ride does not compel the conclusion that she was, therefore, able to resist when being woken up during the ride. The expert testimony was clear that

25

her peak level of intoxication would be in the hour after drinking; i.e., about the time the jury found she was raped. The evidence supports the verdict.

III. *Senate Bill 567 Requires Resentencing*

On Tapiacastro's final contention, the parties are in agreement: Senate Bill 567 requires that Tapiacastro be resentenced. We agree.

"On January 1, 2022, while [Tapiacastro's] appeal was pending, Senate Bill 567 amended section 1170 in several respects. Relevant here is the fact that section 1170, subdivision (b), now makes the middle term the presumptive sentence," and the trial court may only impose the upper term if the circumstances in aggravation "'have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial.' [Citation.]" (*People v. Whitmore* (2022) 80 Cal.App.5th 116, 131.) "This case is not yet final, so [defendant] is entitled to the retroactive application of section 1170, subdivision (b), as amended by Senate Bill 567." (*Ibid.* [citing *People v. Flores* (2022) 73 Cal.App.5th 1032, 1039].)

Here, the trial court sentenced Tapiacastro to the upper term of eight years on count 1, forcible rape of an intoxicated person; the middle term of three years on count 3; and the middle term of two years on count 4, with counts 3 and 4 concurrent to count 1 and stayed pursuant to section 654. The court weighed the circumstances in aggravation and mitigation. As a factor in mitigation, it found that Tapiacastro did not have a prior criminal history (California Rules of Court, rule 4.423(b)(1)). The court found four factors in aggravation: that Tapiacastro's crime involved a high degree of cruelty, viciousness, and callousness (rule 4.421(a)(1)); that the manner in which the crime was carried out indicated planning (rule 4.421(a)(8)); that the victim was particularly vulnerable (rule 4.421(a)(3)); and that Tapiacastro posed a serious danger to society (rule 4.421(b)(1)). The jury made no findings on these issues, nor did Tapiacastro

26

stipulate to them. Accordingly, we will vacate the current sentence and remand for resentencing.

DISPOSITION

The trial court's order denying Tapiacastro's petition to unseal juror contact information is reversed, and the court is instructed to enter a finding that Tapiacastro's petition established a prima facie showing of good cause for the release of the personal juror identifying information. The court shall then proceed on the petition in compliance with Code of Civil Procedure section 237, subdivisions (b) to (d).

The sentence is vacated, and the matter is remanded for the trial court to resentence Tapiacastro applying section 1170, subdivision (b), as amended by Senate Bill 567. Following resentencing, the trial court clerk shall prepare an amended abstract of judgment and forward a certified copy to the Department of Corrections and Rehabilitation.

In all other respects, the judgment is affirmed.

O'LEARY, P. J.

WE CONCUR:

GOETHALS, J.

DELANEY, J.

27